UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

| | |
|---|---|
| AFFILIATES, Inc., et al,<br><br>　　Plaintiffs,<br><br>　v.<br><br>RICHARD ARMSTRONG and LESLIE CLEMENT,<br><br>　　Defendants. | NO. CV-09-149-BLW<br><br>**MEMORANDUM OPINION AND ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER** |

**BEFORE THE COURT** is the Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Ct. Rec. 3), to which the Defendants have responded in opposition (Ct. Rec. 12) and the Plaintiffs have replied (Ct. Rec. 14). The Motion was heard via telephonic oral argument on April 28, 2009. The Plaintiffs are a group of Idaho Residential Habilitation Affiliates ("RHA") and the Defendants are the Director and Medicaid Director of the Idaho Department of Health and Welfare ("Department"). James Piotrowski appeared on behalf of the Plaintiffs, and Peg Dougherty appeared on behalf of the Defendants. This Order is intended to memorialize and supplement the oral rulings of the court.

*I. Background*

　　This controversy arises out of the appropriation of state funds in Idaho for the oversight of non-institutional, residential care of developmentally disabled persons under the Medicaid Act. The Medicaid Act provides federal funding to participating states for the provision of medical care and treatment for those persons whose resources and income prohibit them from otherwise obtaining such services. *See* 42 U.S.C. §§ 1396 *et. seq.*

ORDER - 1

(Medicaid Act); 42 C.F.R. §§ 430 *et. seq*. (implementing regulations of the Medicaid Act); I.C. § 56-251(2)(b) ("The broad policy goal for the medicaid program [in Idaho] for persons with disabilities or special health needs is to finance and deliver cost-effective individualized care."). The Medicaid Act requires a participating state to develop a state plan which describes the policy and methods to be used to set payment rates for each type of service included in the program. 42 C.F.R. § 447.201(b). The Director of the Idaho Department of Health and Welfare has authority to design Idaho's Medicaid coverage plans (I.C. § 56-253(1)), and each plan "shall include explicit policy goals for the covered population identified in the plan, as well as specific benefit packages, delivery system components and performance measures..." (I.C. § 56-253(3)).

A participating state may seek a waiver from the Secretary of the U.S. Department of Health for certain components of Medicaid requirements. In particular a state may request the ability to pay for home or community-based habilitation services ("HCBS") as an alternative to state-provided institutional care for certain disabled patients. 42 U.S.C. § 1396n(c). However, states granted such waivers must still comply with 42 U.S.C. § 1396a(a)(30)(a), which requires a state plan to:

> provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan...as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area...

RHAs serve as quality assurance and oversight liaisons between those developmentally disabled persons living in the community under the HCBS Medicaid waiver and the state of Idaho. Idaho statutes codify the responsibilities and services that must be provided by an RHA in order to qualify for state reimbursement under Idaho's HCBS waiver. *See* IDAPA 16.04.17.000-500.

On March 31, 2009, the Idaho Department of Health and Welfare released IR 2009-06, which is the subject of this Motion. IR 2009-06 altered the reimbursement for RHAs, "unbundling" the previous system by which daily rates were paid, and instead limited

ORDER - 2

reimbursement based on 15-minute units. Of substantial import is the provision that the maximum reimbursable number of 15-minute units, payable at $10.95/unit, is limited to 140 units in the beneficiary's first year of receiving reimbursement, and 120 units annually each year thereafter. Assuming most reimbursement beneficiaries are not in their first year of providing services, reimbursement is capped at $1,314.00 annually. The previous daily rate yielded a maximum annual reimbursement of $2,905.40. This new figure constitutes a 55% reduction in the reimbursement available to RHAs under Idaho's HCBS Medicaid waiver. Despite the rate cut, IR 2009-06 explicitly states that no changes have been made in the services which an RHA is required to provide to correspond with the 55% reduction in reimbursement rates. IR 2009-06 is set to take effect on May 1, 2009.

The Plaintiffs allege that during preliminary meetings with the Department it admitted that the only consideration in determining the new rates were budgetary demands, ignoring quality care issues. They claim that the answer given by the Department to numerous questions regarding such issues as services and studies was that the Department "looked at the savings they needed" (Ct. Rec. 3, Attach. 2, ¶ 25). It is also alleged that the Idaho Department claimed that the federal Center for Medicaid Services ("CMS") was requiring the shift away from daily rates, but later admitted this was not true (Ct. Rec. 3, Attach. 17, ¶ 29). It is further alleged that the Department admitting arriving at the new rates simply by considering service requirements and arriving at a number (Ct. Rec. 3, Attach. 17, ¶ 30). Plaintiffs claim that the Department admitted having little knowledge of what RHAs do, that no RHAs were involved in the determination of new rates, and that federal regulation requirements were not considered (Ct. Rec. 3, Attach. 17, ¶ 29). It is also alleged that the Department admitted to not knowing how the new rates would allow for clients to receive sufficient services (Ct. Rec. 3, Attach. 2, ¶ 24).

There is nothing in the record or the text of IR 2009-06 to indicate that the implementation of the reduced rates is premised on any concern other than budgetary ones, in direct contravention of *Orthopaedic Hospital v. Belsh*. 103 F. 3d 1491, 1496 (9th Cir. 1997). There is no evidence that the Department, through reasonable cost study and

ORDER - 3

analysis, concluded that the new rates can provide the quality of medical care and access required by *Independent Living Center v. Shewry*, 543 F. 3d 1050, 1065-66 (9th Cir. 2008) and *Orthopaedic Hospital*. Accordingly, the court find that the Plaintiffs possess a strong likelihood of success on their claim that IR 2009-06, as enacted, violates 42 U.S.C. § 1396a(a)(30)(a).

There is no evidence that Idaho has fulfilled its statutory obligations under 42 C.F.R. § 430.12 to submit the substantive amendments of its state plan to the federal CMS for approval. See *Washington State Health Facilities Ass'n v. Washington Dep't of Soc. And Health Serv.,* 698 F.2d 964 (9th Cir. 1982)(holding that the state department could not enforce changes in its method of reimbursing nursing care facilities without first receiving federal approval); *Exeter Memorial Hosp. Ass'n v. Belshe*, 145 F.3d 1106 (9th Cir. 1998)(holding same). Also, there is no evidence in the record or brought to the attention of the court indicating that the Department has complied with Idaho Code § 56-118, which requires numerous steps to be taken by the Department when determining reimbursement rates for, *inter alia*, RHAs

*II. Standard of Review*

The Plaintiffs seek both a temporary restraining order and a preliminary injunction; however, only the motion for a temporary restraining order is currently at issue before this court. The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction. *Lockheed Missile & Space Co., Inc. v. Hughes Aircraft Co.*, 887 F.Supp. 1320, 1323 (N.D.Cal.1995). The propriety of preliminary injunctive relief requires consideration of two factors; (1) the likelihood of the plaintiff's success on the merits; and (2) the relative balance of potential hardships to the plaintiff, defendant, and the public. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839-40 (9th Cir.2001). These two factors have been incorporated into a test under which the moving party may meet its burden by demonstrating either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. *American Tunaboat Assoc. v. Brown*,

ORDER - 4

67 F.3d 1404, 1411 (9th Cir.1995). These formulations are not different tests, but represent two points on a sliding scale in which the degree of irreparable harm increases as the probability of success on the merits decreases. *Int'l Jensen Inc. v. Metrosound U.S.A. Inc.*, 4 F.3d 819, 822 (9th Cir.1993) (citations omitted). Plaintiffs seeking a preliminary injunction in a case in which the public interest is involved must establish that they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 129 S.Ct. 365, 376 (2008).

*III. Discussion*

For the reasons stated orally and herein, the court finds that both elements necessary for the granting of a temporary restraining order are present. Success on the merits is likely as Idaho has not presented evidence of compliance with 42 U.S.C. § 1396a(a)(30)(a) through its enactment of IR 2009-06, and there exists the possibility of irreparable harm to the developmentally disabled clients who benefit from the oversight and quality assurance services RHAs provide.

*A. Standing*

The Government contends that the Plaintiffs' preemption theory of standing fails because IR 2009-06 does not require the Plaintiffs to engage in any action that contravenes 42 U.S.C. § 1396a(a)(30)(a). However, this argument is an inaccurate characterization of both the Plaintiffs' argument and the statutes in question, and the court finds that the Plaintiffs have standing to bring this action. 42 U.S.C. § 1396a(a)(30)(a) is a requirement statute applicable to state plans, one that places duties of quality of and access to health care on states implementing HCBS waivers under the Medicaid Act. The statute's only obligations fall on the states in the context of the formulation of their individual plans for Medicaid reimbursement. The Plaintiffs' theory is one of federal preemption, namely that IR 2009-06 as enacted is preempted by the requirements of 42 U.S.C. § 1396a(a)(30)(a), and such a claim is actionable under the Supremacy Clause.

Under well-established law of the Supreme Court, this court, and the other circuits,

ORDER - 5

a private party may bring suit under the Supremacy Clause to enjoin implementation of state legislation allegedly preempted by federal law. In this case, [Plaintiff] alleges that the [Medicaid reimbursement] cuts mandated by [California statute] AB 5 violate the substantive provisions of the federal Medicaid Act, and are therefore unlawful. They do not seek to enforce any substantive "right" conferred by statute; instead, they argue that the cuts mandated by AB 5 are themselves unenforceable, because they exceed the scope of the State's discretion under the Act and violate federal standards. As AB 5 is causing injury to one or more of the plaintiffs and the other requirements of Article III standing are met, no more is required to allow this suit to go forward.

*Independent Living Center v. Shewry*, 543 F.3d 1050, 1065-66 (9th Cir. 2008).

*B. Likelihood of Success on the Merits*

The success of the Plaintiffs' Motion hinges upon the interpretation of 42 U.S.C. § 1396a(a)(30)(a), and whether the requirements contained therein are violated by IR 2009-06, specifically the process by which it was enacted.

Under 42 U.S.C. § 1396a(a)(30)(a), a state plan for reimbursing Medicaid costs must:

provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan...as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area...

The Plaintiffs contend that because the Idaho Department of Health and Welfare did not assess the requisite factors, IR 2009-06 violates 42 U.S.C. § 1396a(a)(30)(a). The 9th Circuit, presented with a similar case, set forth the conditions necessary for a reduction in Medicaid reimbursement rates to satisfy 42 U.S.C. § 1396a(a)(30)(a).

We conclude that the Director must set hospital outpatient reimbursement rates that bear a reasonable relationship to efficient and economical hospitals' costs of providing quality services, unless the Department shows some justification for rates that substantially deviate from such costs. *To do this, the Department must rely on responsible cost studies, its own or others', that provide reliable data as a basis for its rate setting...The Department cannot know that it is setting rates that are consistent with efficiency, economy, quality of care and access without considering the costs of providing such services.* It stands to reason that the payments for hospital outpatient services must bear a reasonable relationship to the costs of providing quality care incurred by efficiently and economically operated hospitals.

*Orthopaedic Hosp. V. Belshe*, 103 F.3d 1491, 1496 (9th Cir. 1997)(emphasis added).

Furthermore, "a state plan must establish reimbursement rates for health care providers that are both consistent with high-quality medical care (the 'quality of care

ORDER - 6

provision') and sufficient to enlist enough providers to ensure that medical services are generally available to Medicaid recipients (the 'access to care provision')." *Independent Living Center,* 543 F.3d, at 1053. "Because *Orthopaedic Hospital* is binding authority on this Court, the Court finds that when the State of California seeks to modify reimbursement rates for health care services provided under the Medi-Cal program, *it must consider efficiency, economy, quality of care, and equality of access, as well as the effect of providers' costs on those relevant statutory factors*." *Independent Living Center v. Shewry*, 2008 WL 3891211, *4 (C.D.Cal. 2008)(emphasis added)(on remand from *Independent Living Center v. Shewry*, 543 F.3d 1050 (9th Cir. 2008)).

While obviously budgetary constraints may be considered along with other factors, is not justifiable for the Department to reimburse providers substantially less than their costs for *purely* and *solely* budgetary reasons. See *Orthopaedic Hosp.,* 103 F.3d, at 1499; *Beno v. Shalala*, 30 F.3d 1057, 1069 (9th Cir.1994) (rejecting only budget cutting as a legitimate justification for the approval of a waiver from federal AFDC requirements); *Arkansas Medical Society, Inc. v. Reynolds*, 6 F.3d 519, 531 9 (8th Cir. 1993)(rejecting "exclusively budgetary" justification for rate cuts to Medicaid providers); *AMISUB v. Colo. Dep't of Social Serv.*, 879 F.2d 789, 800-01 (10th Cir.1989)(rejecting state Medicaid plan that resulted in 46% reduction in provider reimbursement as being based solely on budgetary constraints: "While budgetary constraints may be a factor to be considered by a state when amending a current plan ... budgetary constraints alone can never be sufficient").

The record supports the conclusion that the Plaintiffs' chances of success on the merits are substantial. In the text of IR 2009-06 itself, budgetary concerns are the only justification given for the reduction of reimbursement rates:

> On September 26, 2008, through Executive Order 2008-03, the Governor directed all state agencies to hold back one percent of their general fund budgets in the current fiscal year due to the downturn in the economy. On December 1, 2008, the Governor directed an additional three percent hold-back through Executive Order 2008-05. As one of our responses to this [rate cuts are subsequently elaborated].

*C. Irreparable Harm*

The second required element that must be present is a demonstration of irreparable

ORDER - 7

harm that will be suffered if a temporary restraining order is not issued.  The Plaintiffs set forth two theories of irreparable harm; that their business will suffer irreparable financial harm, and that the developmentally disabled persons for which they provide oversight and quality assurance services will suffer irreparable harm if the Department is not enjoined from implementing IR 2006-09 on May 1, 2009.

*i. Financial Harm to Plaintiffs*

The Plaintiffs allege that, if reimbursement rates are reduced by 55% by IR 2009-06, it will no longer be financially feasible for them to provide residential habilitation oversight services. They claim their options will be to continue to provide these services at an operating loss, or simply close (See, e.g., Ct. Rec. 3, Attach. 17, ¶ 20; Ct. Rec. 3, Attach. 2, ¶ 20; Ct. Rec. 3, Attach. 3, ¶ 21 etc.).

Generally, monetary losses do not constitute irreparable harm. *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League,* 634 F.2d 1197, 1202 (9th Cir. 1980).  However, one Circuit Court has held that because the 11th Amendment precludes recovery of monetary damages against a state, monetary losses due to state action are irreparable, though this finding is not conclusive as to the existence of actual harm. *Kansas Health Care Ass'n, Inc. V. Kansas Dept of Social and...,* 31 F.3d 1536, 1543 (10th Cir. 1994).

The reimbursement for any RHA services provided subsequent to May 1, 2009 would be at the 55% lower annual rate under IR 2009-06. Such losses may not drive a person or company out of business immediately, but they are irreparable under *Kansas Health.*

*ii. Harm to Medicaid Recipients*

Of greater import, and, accordingly much more persuasive to the court than the argument of financial losses, *supra,* is the claim that those disabled persons who benefit from the oversight and quality assurance services that the RHAs provide will suffer irreparable harm if a temporary restraining order is not issued.  The Plaintiffs allege they cannot feasiblely operate at the reduced rates, and many of them will be forced to close if IR 2009-06 goes into effect.  Though it is unclear how quickly this might happen, it is not reasonable to think that RHAs would continue to operate at a loss.  More likely, they would

ORDER - 8

begin to scale back operations, or even conceivably close their doors, on or about May 1, 2009, the day IR 2009-06 is set to go into effect. The Plaintiffs allege that many severely disabled citizens of Idaho will lose the services of RHAs, and they might or might not be able to find replacements, either leaving them without this aid for a period of time or permanently.

The Defendants dually contend that budget cuts and the poor health of the national economy are forcing the 55% reduction in reimbursement rates, but that it is unequivocally prepared to fill any void caused by a reduction in RHA providers and services. These positions do not, at this stage, seem tenable. The court finds that irreparable harm will be suffered by those requiring society's help the most, namely the low income, developmentally disabled persons for which RHAs provide valuable support, oversight, and quality assurance.

*iii. Public Policy*

The provision of services for those who are less fortunate and cannot take care of themselves is one of the most important undertakings in which society and governments can engage. As provided in the Medicaid Act, any reduction in the aid afforded these people, especially one so drastic as the 55% proposed by IR 2009-06, should be undertaken only after the utmost consideration of the numerous relevant factors, from the quality of care to the financial feasibility of provision of services to the long term consequences and alternatives. There is no apparent indication in the record that the State of Idaho considered or studied *any* of these factors. Cutting programs such as Medicaid reimbursements without adequate thought or attention to those who depend on these benefits or the effects of such cuts on medical services is inappropriate and contrary to law. The State of Idaho might be willing to accept reduction of care to the disabled as a necessary evil or requirement in light of real and pressing budgetary concerns, but such a decision should not be hastily made. Such decisions can only be made after a careful, impartial, and reasonable analysis and study dictated by 42 U.S.C. § 1396a(a)(30)(a). *Orthopaedic Hospital*, *supra*.

Lesser harm will be suffered by the State of Idaho through the issuance of a temporary restraining order and preservation of the status quo. The worst-case scenario for Idaho is the interim expenditure of funds if it ultimately prevails on the merits of the Motion for Preliminary Injunction and IR 2009-06 is then allowed to go into effect.  The potential loss to the state of Idaho is purely financial, while the loss of RHAs would be not only financial, but a loss of required human services for the disabled individuals in the State.

*D. Bond*

Though Fed. R. Civ. P. 65(c) requires the posting of a bond by a party seeking a preliminary injunction, such bond may be waived by the district court, particularly in a case where any cost to the government, if they are found to be wrongfully enjoined, will be nominal, such as in the case at hand. *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999).  Accordingly,

**IT IS HEREBY ORDERED:**

1. The Plaintiffs' Motion for Temporary Restraining Order (Ct. Rec. 3) is **GRANTED** to the extent stated herein, the court waiving the bond requirement of Fed. R. Civ. P. 65(c).  The Defendants are restrained from implementing IR 2009-06 until the further order of this court.

2. Ruling on the Plaintiff's Motion for Preliminary Injunction (Ct. Rec. 3) is **RESERVED**.

3. The Parties shall confer and thereafter serve and file, either jointly or individually, a report on or before May 20, 2009 as to the necessity of an evidentiary hearing in connection with the court's hearing of the Plaintiffs Motion for Preliminary Injunction.

The Clerk is hereby directed to enter this Order and furnish copies to counsel.

**DATED** this 30TH day of April, 2009.

       s/ Justin L. Quackenbush
       JUSTIN L. QUACKENBUSH
     SENIOR UNITED STATES DISTRICT JUDGE

ORDER - 10