LAWRENCE G. WASDEN
ATTORNEY GENERAL
STATE OF IDAHO

PEG M. DOUGHERTY, ISB #6043
Lead Deputy Attorney General
Contracts & Administrative Law Division

CHARINA A. NEWELL, ISB #6783
Deputy Attorney General
Contracts & Administrative Law Division
450 W. State Street, 10th Floor
P.O. Box 83720
Boise, ID 83720-0036
Telephone: (208) 334-5537
Fax: (208) 334-5548
newellc@dhw.idaho.gov

Attorneys for Defendants

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| AFFILIATES, Inc., HUMAN SERVICE CONNECTION, Inc., H.A.S., Inc., ALTERNATIVE NURSING SERVICES, Inc., A WAY THROUGH COUNSELING CENTER, Inc., CENTRAL IDAHO AFFILIATES, Inc., COTTONWOOD CARE AGENCY, DUNSTAN HALL & ASSOCIATES, Inc., PROVIDER AFFILIATE AGENCY, Inc., ROBINSON & AFFILIATES, Inc., SCOTT COMMUNITY CARE, PLLC, TOMORROW'S HOPE SATELLITE SERVICES, Inc., WILLIAMS & URALDE, Inc., <br><br> Plaintiffs, <br><br> v. <br><br> RICHARD ARMSTRONG, in his official capacity as Director of the Idaho Department of Health and Welfare, and LESLIE CLEMENTS, in her official capacity as Administrator of the Medicaid Division of the Idaho Department of Health and Welfare, <br><br> Defendants. | Case No. 09-149 <br><br> DECLARATION OF PAIGE GROOMS |

I, PAIGE GROOMS, declare as follows:

1.      My name is Paige Grooms.  I am employed by the Idaho Department of Health and Welfare ("Department"), Division of Medicaid ("Division"), Bureau of Developmental Disability Services ("Bureau"), as a Developmental Disability Alternative Care Coordinator.  I have held my current position since December 2007.  Prior to assuming that position, I was employed in March 2005 by the Department, Division of Family and Children's Services ("FACS"), Region 4—Children's Mental Health, as a Clinician.  I received my Bachelors of Science degree from Boise State University in 1986 and a Masters of Science in Rehabilitation Counseling in 2002 at Western Oregon University.  I hold a national certification as a Certified Rehabilitation Counselor from the Commission on Rehabilitation Counselor Certification in 2003.  I also am a Licensed Professional Counselor in the State of Idaho.  Overall, I have been employed continuously since 1991 in positions within the private and public sectors that concentrated on providing services to adults with developmental disabilities, vocational rehabilitation assistance, and mental health counseling.  My curriculum vita is attached hereto as Exhibit A.

2.      In my current position, I provide subject matter expertise and guidance to the Bureau, FACS, service providers and the public on a variety of Medicaid-related matters, including Idaho's Medicaid state plan, waivers to such plan, and relevant statutes, administrative rules, Centers for Medicaid and Medicaid Services ("CMS") operational guidelines insofar as they pertain to developmental disability benefits offered by Idaho Medicaid for adults.  My responsibilities include preparing policy work analyses such as responses to inquiries and complaints from external and internal sources that warrant signature by the Department's Director or the Division's Administrator; Medicaid information releases; administrative rule promulgation and presentation; and ensuring that departmental policy, as initially formulated and thereafter implemented, remains consistent with state and federal requirements.  Aside from these general duties, I have responsibility for preparing Medicaid state plan amendments, and amendments to Idaho's adult developmental disabilities program ("DD") waiver.  With respect

to the DD waiver, I serve as liaison with the CMS with respect to annual monitoring utilization and cost effectiveness of the waiver.

3.      With particular reference to the subject matter of this litigation, I am supervising the preparation and submission of a "1915(c) home and community-based waiver" amendment to CMS, United States Department of Health and Human Services. This waiver is authorized under the Social Security Act, 42 U.S.C. § 1396n(c), and, as described in CMS's "Instructions, Technical Guide and Review Criteria" Manual (Jan. 2008) ("CMS Manual" or "Manual"), is intended "to enable states to address the needs of individuals who would otherwise receive costly institutional care by furnishing cost-effective services to assist them to remain in their homes and communities." Ex. B, CMS Manual at 5. The Manual is quite lengthy but can be viewed in its entirety at the following Internet address:

http://www.dads.state.tx.us/providers/waiver_instructions /cms_waiver_instructions.pdf (last visited July 14, 2011). The relevant excerpts of the Manual are attached hereto as Exhibit B.

4.      Participation in the home and community-based services ("HCBS") waiver is optional, and States are given the discretion to identify the "waiver services" that they wish to offer. Waivers in the first instance must be approved by CMS, as do any amendments to existing waiver programs. Once approved, a 1915(c) waiver allows the involved State to receive federal funding for the covered participant services performed pursuant to private contractual relationship between the participant or his/her guardian and another party and for "waiver operational and administrative functions" performed by the involved state Medicaid agency or an entity with which the agency has contracted. Medicaid eligible individuals are given the option under 42 U.S.C. § 1396(c)(2)(C) to choose participation in the HCBS waiver program or receipt of non-waiver program institutional services.

5.      Idaho has three approved 1915(c) HCBS waiver programs: adults with developmental disabilities, adults who are aged and disabled persons, and children with developmental disabilities. The DD waiver program was approved in October 1992 and has operated continuously since then. Pursuant to the DD waiver, individuals who qualify to receive

medical assistance and rehabilitation services under the Idaho Medicaid state plan and who also meet institutional level of care requirements to receive care in a Intermediate Care Facility for People with Intellectual Disabilities ("ICF-ID") may choose to reside in either their own home or in a "Certified Family Home" ("CFH"). *See* IDAPA 16.03.10.702.03. A CFH is defined as "[a] home certified by the Department to provide care to one (1) or two (2) adults, who are unable to reside on their own and require help with activities of daily living, protection and security, and need encouragement toward independence." *Id.* 16.03.10.010.17; *id.* 16.03.19.010.07; *see also id.* 16.03.19.140 (authorizing maximum of four residents under certain circumstances). Detailed rules control their operation. *Id.* 16.03.19. A CFH submits claims for payment from the Department for services rendered to a waiver participant under the category of "CFH services."

6.     As the term "Certified Family Home" suggests, a CFH is reimbursed for providing a non-institutional environment tailored for the benefit of DD waiver program participants. The Department's rules thus prohibit certification of a home if the home "provides room or board to any person who is not a resident . . . or a family member." IDAPA 16.03.19.100.04.a. A "resident" is defined in part as an individual "requir[ing] supervision and one (1) or more of the following services: protection, assistance with decision-making and activities of daily living, or direction toward self-care skills." *Id.* 16.03.19.010.23. The term "family member" is not defined, but "relative" means "[a] person related by birth, adoption, or marriage to the first degree and grandparent and grandchild." *Id.* 16.03.19.010.24. CFH certification is issued to a particular individual, known as a CFH provider, who is "[t]he adult member of the certified family home living in the home who is responsible for providing care of the resident." *Id.* 16.03.19.010.08. The Department issues the certification. *Id.* 16.03.19.100.01.

7.     The certification requirements for CFH providers are identified in IDAPA 16.03.19.100. They direct the Department to make a "certification study" that consists, in part, of a home visit, interviews with the proposed provider and, if necessary, the provider's family, and medical or psychological examinations when deemed appropriate. *Id.* 16.03.19.100.05. Renewal of the certification must occur annually. *Id.* 16.03.19.110.03. The provider also must

satisfy certain training, including resident rights, cardio-pulmonary resuscitation certification, emergency procedures, fire safety, completion of medication-assistance course, and knowledge of complaint investigations and inspections procedures. *Id.* 16.03.19.100.06. Aside from the certification requirements and responsibilities of a CFH provider, the DD waiver requires that these providers facilitate providing an environment for their DD waiver residents consistent not only with their day-to-day living and medical needs but also with their assessed habilitation needs. To meet these objectives, CFH providers "must be *affiliated* with a Residential Habilitation Agency". This affiliation service provided by a residential habilitation agency ("RHA") "provides oversight, training, and quality assurance to the certified home provider." *Id.* 16.03.10.705.01 (emphasis added). RHA providers, in other words, are not themselves residential habilitation providers when affiliation services are being provided, but instead assist CFH providers who, in turn, provide the residential habilitation to the DD waiver participant. The RHA submits claims for "affiliation." The "affiliation" function referred to in the current 1915(c) DD waiver is therefore an adjunct to the "residential habilitation" waiver service that is performed by CFH providers. Again, the "provider" for the covered waiver service—residential habilitation—is the CFH and not the affiliated RHA.

8.     Idaho's DD Waiver can be viewed in its entirety at the following address: http://healthandwelfare.idaho.gov/LinkClick.aspx?fileticket=5k_kjVfLXJ4%3d&tabid=123&mi d=2280. The relevant excerpts of the DD Waiver are attached hereto as Exhibit C. The concept of "affiliation" is referred to in Idaho's DD waiver in two places. In Appendix C of the DD Waiver, which specifies the services that are provided in the waiver under the service entitled "Residential Habilitation," there is a section for CFH providers which states: "Must be affiliated with Residential Habilitation Agency and meet the standards contained in IDAPA 16.03.10.705 and IDAPA 16.04.17." Ex. C, pg. 41. Also in Appendix C, there is a section for RHAs which states: "Residential Habilitation Agencies must comply with all standards contained in IDAPA 16.03.10.705 and IDAPA 16.04.17. As outlined in these rules, direct service staff must meet the

following qualifications: , , , Additional training must be completed within six months of affiliation with a residential habilitation agency … ." Ex. C, pg. 42.

9.      The affiliation function is only covered under the DD Waiver; it is not part of Idaho's Medicaid State Plan.

10.     Individuals entitled to HCBS under Idaho's 1915(c) DD waiver program have the option, as stated in paragraph 5, to receive covered services in their own homes.  In contrast to Medicaid-eligible participants receiving residential habilitation services from CFH providers, these individuals receive such services from individuals employed by RHAs in the form of "supported living."  IDAPA 16.03.10.705.01.  The term "residential habilitation" is defined in the rules governing RHAs as "[s]ervices consisting of an integrated array of individually-tailored services and support furnished to an eligible participant which are designed to assist them to reside successfully in their own homes, with their families, or alternate family homes."  *Id.* 16.04.17.011.19.  These services are identified with greater specificity in the Medicaid Enhanced Plan Benefits rules and address such matters as self-directed decision-making, money management, daily living skills, socialization skills, mobility skills and "[b]ehavior shaping and management."  IDAPA 16.03.10.703.01.  Residential habilitation service providers who perform such services for participants in their own homes—*i.e.*, "direct care or services"—must satisfy a significant number of requirements and must be employed by an RHA.  *Id.* 16.03.10.705.01.  The employing RHA submits claims for "supported living" for such direct care or services.  Unlike the "affiliation" function, residential habilitation-supported living services are provided directly to participants by the RHA that is the "provider" of the waiver service.

11.     Detailed procedures govern certification and operation of residential habilitation agencies.  *See, e.g.*, IDAPA 16.04.17.100 (certification requirement); 16.04.17.201 (governing board requirement unless single or partnership-owned); 16.04.17.202 ("administrator" requirement); 16.04.17.203 (staff and affiliated provider training requirements); 16.04.17.300 (policy manual requirement); 16.04.17.301 (personnel policy requirements).  These procedures address the responsibilities of residential habilitation agencies when providing "supported living"

services to participants residing in their own homes and those providing "affiliation" services to CFHs. *See* 16.04.17.010.04. Certain of the procedures, however, have particular relevance to residential habilitation agencies when acting as the provider of "supported living" services. *e.g.*, *id.* 16.04.17.403 (participant finances); 16.04.17.404 (promoting communication between participants with parents, guardians or others); 16.04.17.405 (requiring written policies to prohibit mistreatment, neglect or abuse of participants). They thus reflect the bifurcated nature of the functions provided by residential habilitation agencies.

12.    The Department conducts regular quality assurance surveys of both CFHs and RHAs to ensure the services being rendered meet the respective requirements for each provider type.

13.    The Idaho Legislature began a process in its 2006 session through passage of House Concurrent Resolution No. 51 to use "selected" contracting in the State's Medicaid program to achieve cost economies without diminishing service quality. 2006 Idaho Sess. Laws, H.C.R. No. 51, at 1411; *see also* 2006 Idaho Sess. Laws Ch. 278, § 1 (codified in part at Idaho Code § 56-253(6)) (authorizing Department to enter into medical and related contracts when "beneficial to participant health outcomes as well as economically prudent for the Medicaid program"). In the 2010 session, the Legislature directed the Department's Division of Medicaid to "[r]eview and implement . . . selective contracts." 2010 Idaho Sess. Laws Ch. 268, § 14.B. The 2011 Legislature reiterated this direction in the 2011 Medicaid Cost Containment and Health Care Improvement Act, which provided in part that "the current health care delivery system of payment to Medicaid health care providers on a fee for service basis does not provide the appropriate incentives and can be improved by incorporating managed care tools, including capitation and selective contracting, with the objective of moving toward an accountable health care system that results in improved health outcomes." 2011 Idaho Sess. Laws Ch. 160, § 12 (codified at Idaho Code § 56-261(1)).

14.    The Department determined that one area where direct contracting would be appropriate in terms of quality and cost-effectiveness was in the provision of the "affiliation"

function currently performed by residential rehabilitation agencies. It therefore commenced a competitive bidding process that culminated in the selection of Community Partnerships of Idaho, Inc. ("Community Partnerships") as the sole entity to carry out the "affiliation" function. The Department entered into a contract with Community Partnerships effective June 6, 2011, pursuant to which the latter will begin performing the affiliation function on August 5, 2011. The contract's scope of work is described generally as "Residential Habilitation Program Coordination for Certified Family Homes." The contract's "scope of work" provisions detail the various activities attendant to that overall function. The contract does not affect the current certified status of any residential habilitation provider nor their ability to offer their services to participants residing in their own homes—*i.e.*, "supported living" services. Neither does the contract affect the certification status of any CFH provider. CFH providers were notified that Community Partnerships would be responsible for such function by letter dated June 10, 2011 from Leslie M. Clement, the Division of Medicaid's Administrator and attached hereto as Exhibit D. A letter notifying RHAs was also sent on June 24, 2011 from Ms. Clement. A copy of that letter is attached hereto as Exhibit E.

15.    The Department has undertaken two administrative actions to facilitate assumption of the affiliation function by Community Partnerships:

- It has prepared for submission to CMS for approval an amendment to the existing 1915(c) DD waiver that identifies residential habilitation coordination for CFHs as an administrative function. Given that "affiliation" consists of oversight, training, and quality assurance of CFH providers, the Department also determined that it fit into a waiver operational and administrative function, namely "quality assurance and quality improvement activities." Ex. B, CMS Manual at pgs. 64-67. As explained in the CMS Manual at pages 64-67, waiver "operational and administrative functions" consist, in part, of certain activities that are listed in Item A-7 of the Manual. The residential habilitation coordination for CFHs function is encompassed in the activity titled "quality assurance and quality improvement activities." The CMS Manual further recognizes at page 67 that "[w]aiver operational activities and functions

may be performed by entities that are under contract with the Medicaid agency." The Department will request that CMS make the waiver amendment effective as of August 5, 2011. The waiver amendment application will be submitted on July 22, 2011.

- It has prepared for issuance in the August 2011 Idaho Administrative Bulletin proposed/temporary rules that amend in various respects IDAPA 16.03.10 ("Medicaid Enhanced Plan Benefits"). Pursuant to authority under Idaho Code § 67-5226, the Department will make the proposed/temporary rule effective upon publication. Review and approval by the Legislature during the 2012 session remain required. *See* Idaho Code § 67-5291. The August 2011 Idaho Administrative Bulletin will be published on August 3, 2011.

16.    The Plaintiffs in this matter express concerns over the number of "face to face" interviews that Community Partnerships is required to conduct with CFH providers and participants. They suggest that these interviews are limited to one each year. However, the relevant "scope of work" provision states Community Partnerships must "[c]omplete *at least* one (1) annual face to face interview with the CFH provider and participant." [Emphasis added.] An annual interview is thus a minimum, or a floor, and must be viewed in the overall context of Community Partnership's contractual duties. For example, other provisions require Community Partnerships to monitor the participant's program implementation plans ("PIP") on a quarterly basis and to "[t]rack, review, and report outcome data for the implemented PIPs for each participant." More generally, Community Partnerships must "[t]rack participant approved [individual service plans] and redetermination dates as needed for timely submission of the Residential Habilitation Program Coordination Plan including PIPs to CFH provider." Community Partnerships also has various reporting obligations, including "[r]eporting concerns about CFH providers not following through with the implementation of the habilitation as documented in the PIPs to the appropriate [Department] staff."

This concludes my declaration.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of American that the foregoing is true and correct.

DATED this 19th day of July 2011.

By _Paige Grooms_

PAIGE GROOMS

Subscribed and sworn to before me this 19th day of _July_, 2011.

Notary Public for Idaho

Residence: _Boise, ID_

My Commission Expires: _7/20/13_

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 19th day of July, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and serviced a copy of said document upon all parties by the method listed below:

***Attorneys for Plaintiffs***
James M. Piotrowski
Marty Durand
HERZFELD & PIOTROWSKI, LLP
PO Box 2864
824 W. Franklin Street
Boise, Idaho 83701

☒ CM/ECF

Beth Conner Harasimowicz
Legal Secretary

# EXHIBIT A

# *Paige Grooms, MS, LPC, CRC*

**Idaho Department of Health and Welfare, Division of Medicaid**                    2007-Present
**Boise, Idaho**
**Policy Coordinator (Alternative Care Coordinator)**
**Bureau of Developmental Disabilities Services**
- o   Act as subject matter expert for Idaho benefits offered for individuals with Developmental Disabilities.
- o   Manage complex policy projects from concept to statewide program implementation.
- o   Coordination with BDDS operations team with other Divisions and Agencies as necessary.
- o   Analyze data and information in order to prepare reports to the Division Administrator, Legislators, or Office of the Governor, regarding benefit issues; benefit utilization, federal regulations and proposals, and programs.
- o   Monitor legislative directives and prepare written response to legislative requests.
- o   Act as manager and liaison to the federal government for all developmental disability benefits offered by Idaho Division of Medicaid.
- o   Act as Contract Monitor,
- o   Communicate regularly, formally, and informally with stakeholders in order to address Idaho Medicaid's ongoing projects, statutory requirements and benefit questions.
- o   Ensure Medicaid benefit compliance with all federal and state guidelines and regulations.
- o   Maintain all policy products related to the Division of Medicaid -Bureau of Developmental Disability benefits including: writing formal Department information releases and communication to stakeholders, organize and present at public meetings, develop and implement of all phases of the IDAPA rule promulgation process, including rule writing and legislative presentations, and maintenance of the official Medicaid State Plan and Waiver documents.

**Idaho Department of Health and Welfare**                    2005-2007
**Family and Children's Services-Children's Mental Health**
**Region 4 - Boise, Idaho**
**Clinician**
- o   Assessment and evaluation of mental health disorders.
- o   Formulate, write, and implement treatment plan.
- o   Provide counseling and intervention for families and children.
- o   Utilize professional skills to engage and work cooperatively and collaborate with courts, schools and other medical professionals.
- o   Provide on-going case management through regular follow up with families.
- o   Provide legal testimony regarding results of assessment and treatment plan progress.
- o   Skills: excellent interpersonal skills, professional communication, writing and presentation skills; ability to work well under stress, organization, analytical problem solving, mediation, and critical thinking.

**Developmental Concepts, Inc.**                    2004-2005
**Boise, Idaho**
- o   After relocating from Oregon related to my husband's employment, I was employed as a Children's and Adult Targeted Service Coordinator and Plan Developer as I completed the necessary requirements for Idaho LPC licensure.

**Mountain Valley Mental Health Clinic**                                    1999-2004
**Baker City, Oregon**
**Mental Health Counselor**
- o   Assessment and evaluation of mental health disorders for children and adults.
- o   Formulate, write, and implement treatment plan.
- o   Provide counseling and intervention.
- o   Utilize professional skills to engage and work cooperatively and collaborate with courts, schools, child protective services and other medical professionals.
- o   Provide on-going case management through regular follow up.
- o   Provide legal testimony regarding results of assessment and treatment plan progress.
- o   Skills: excellent interpersonal skills, professional communication, writing and presentation skills, ability to work well under stress, organization, analytical problem solving, mediation, and critical thinking.

## *Education & Professional Certification*

**Capital High School- Boise, Idaho**                                      1979-1981
Graduated -1981

**Boise State University**                                                 1981-1986
Boise, Idaho
Graduated-1986
B.S. - Psychology

**Western Oregon University**                                              1998-2001
Monmouth, Oregon
Graduated-2001
M.S. - Rehabilitation Counseling

**Certified Rehabilitation Counselor Certification (CRC)**                 **2002-Present**
**Licensed Professional Counselor-Idaho (LPC)**                            **2005-Present**

# EXHIBIT B

# Application for a §1915(c) Home and Community-Based Waiver [Version 3.5]

# Instructions, Technical Guide and Review Criteria

## Release Date:
## January 2008



**CENTERS for MEDICARE & MEDICAID SERVICES**

**Disabled and Elderly Health Programs Group
Center for Medicaid and State Operations
Centers for Medicare & Medicaid Services
Department of Health and Human Services**

[Page left intentionally blank for double-sided copying]

# Table of Contents

| | |
|---|---|
| **Introduction** | 1-3 |
| **Description of the §1915(c) HCBS Waiver Authority** | 5-14 |
| Statutory Basis and Legislative History of the HCBS Waiver Authority | 5 |
| Principal Features of the HCBS Waiver Authority | 5-8 |
| Quality Improvement Strategy: Overview | 8-13 |
| Federal Administration of the HCBS Waiver Authority | 13 |
| HCBS Waiver Resources on the Web | 13-14 |
| **Version 3.5 HCBS Waiver Application Overview** | 16-20 |
| Basis and Rationale of the Revised Application | 16-17 |
| Development of the Version 3.5 HCBS Waiver Application | 17-18 |
| Organization of the Version 3.5 HCBS Waiver Application | 18-20 |
| Ongoing CMS Waiver Application Activities | 20 |
| **Waiver Application Submission Requirements, Processes, and Procedures** | 22-32 |
| Use of the Version 3.5 HCBS Waiver Application | 22 |
| Submission of Applications | 22-24 |
| Joint Central Office/Regional Office Waiver Review Process | 24 |
| Policies Concerning New and Renewal Waiver Applications | 24-30 |
| Policies Concerning Waiver Amendments | 30-31 |
| Related Topics | 31-32 |
| **Post Approval Activities** | 33-35 |
| Annual Waiver Report | 33-34 |
| Ongoing CMS-State Dialogue During the Waiver Period | 34-35 |
| CMS Report to State Prior to Waiver Renewal | 35 |
| **Detailed Instructions for Completing the Version 3.5 §1915(c) HCBS Waiver Application** | 37-281 |
| **Using the Application** | 37-41 |
| Application Format | 37-40 |
| Technical Instructions for Completing the Version 3.5 Word-processor Application | 40-41 |
| **Detailed Instructions, Technical Guidance and Review Criteria** | 42-281 |
| **Application for a §1915(c) Home and Community-Based Services Waiver (Module I)** | 42-59 |
| 1.    Request Information | 42-50 |
|      Transition Plan | 45-46 |
| 2.    Brief Waiver Description | 50 |
| 3.    Components of the Waiver Request | 51 |
| 4.    Waiver(s) Requested | 51-54 |
| 5.    Assurances | 54 |
| 6.    Additional Requirements | 54-58 |
| 7.    Contact Persons | 58 |
| 8.    Authorizing Signature | 59 |

# Table of Contents

| Appendix A: Waiver Administration and Operation | 60-72 |
|---|---|
| Requirements: Waiver Administration and Operation | 60-62 |
| Quality Improvement: Administrative Authority | 71-72 |
| **Appendix B: Participant Access and Eligibility** | **73-108** |
| Appendix B-1: Specification of the Waiver Target Group(s) | 73-77 |
| Appendix B-2: Individual Cost Limit | 77-81 |
| Appendix B-3: Number of Individuals Served | 81-88 |
| Attachment #1 to Appendix B-3: Waiver Phase-in/Phase-out Schedule | 85-86 |
| Appendix B-4: Medicaid Eligibility Groups Served in the Waiver | 88-91 |
| Appendix B-5: Post-Eligibility Treatment of Income | 91-99 |
| Appendix B-6: Evaluation/Reevaluation of Level of Care | 99-104 |
| Quality Improvement: Level of Care | 104-106 |
| Appendix B-7: Freedom of Choice | 106-107 |
| Appendix B-8: Access to Services by Limited English Proficient Persons | 108 |
| **Appendix C: Participant Services** | **110-177** |
| Appendix C-1: Summary of Services Covered | 111-114 |
| Appendix C-2: General Service Specifications | 114-124 |
| Quality Improvement: Qualified Providers | 124-125 |
| Appendix C-3: Waiver Services Specifications | 126-140 |
| Technical Guidance Concerning Service Coverage | 128-133 |
| Appendix C-4: Additional Limitations on Amount of Waiver Services | 140-144 |
| Attachment: Core Service Definitions | 145-177 |
| **Appendix D: Participant-Centered Planning and Service Delivery** | **178-179** |
| Appendix D-1: Service Plan Development | 178-185 |
| Appendix D-2: Service Plan Implementation and Monitoring | 185-187 |
| Quality Improvement:  Service Plans | 187-189 |
| **Appendix E: Participant Direction of Services** | **190-220** |
| Independence Plus Designation | 190-192 |
| Participant Direction of Services | 192-193 |
| Appendix E-1: Overview | 194-212 |
| Appendix E-2: Opportunities for Participant Direction | 212-218 |
| **Appendix F: Participant Rights** | **220-226** |
| Appendix F-1: Opportunity for Fair Hearing | 220-221 |
| Appendix F-2: Additional Dispute Resolution Mechanism | 221-223 |
| Appendix F-3: State Grievance/Complaint System | 223-224 |
| **Appendix G: Participant Safeguards** | **226-241** |
| Appendix G-1: Response to Critical Incidents or Events | 226-230 |
| Appendix G-2: Safeguards Concerning Restraints and Restrictive Interventions | 230-235 |

# Table of Contents

| | |
|---|---|
| Appendix G-3: Medication Management and Administration | 235-240 |
| Quality Improvement: Health and Welfare | 240-241 |

| | |
|---|---|
| **Appendix H: Systems Improvement** | 242-247 |

| | |
|---|---|
| **Appendix I: Financial Accountability** | 248-270 |
| Appendix I-1: Financial Integrity and Accountability | 248-249 |
| Quality Improvement:  Financial Accountability | 250-251 |
| Appendix I-2: Rates, Billings and Claims | 251-255 |
| Appendix I-3: Payment | 255-262 |
| Appendix I-4: Non-Federal Matching Funds | 262-265 |
| Appendix I-5: Exclusion of Medicaid Payment for Room and Board | 265-266 |
| Appendix I-6: Payment for Rent and Food Expenses of an Unrelated Live-In Caregiver | 266-267 |
| Appendix I-7: Participant Co-Payments for Waiver Services and Other Cost Sharing | 267-270 |

| | |
|---|---|
| **Appendix J: Cost Neutrality Demonstration** | 272-281 |
| Appendix J-1: Composite Overview and Demonstration of Cost-Neutrality Formula | 273-274 |
| Appendix J-2: Derivation of Estimates | 274-281 |

| | |
|---|---|
| **Request for an Amendment** | 282-284 |
| **Glossary of Terms and Abbreviations** | 286-314 |
| **Index to the Application and Instructions** | 316-324 |
| **Resource Attachments** | |

Attachment A: §1915(c) of the Social Security Act
Attachment B: Federal Regulations Related to the Operation of HCBS Waivers
Attachment C: State Medicaid Director Letters and Other Materials Related to HCBS Waiver
Attachment D:  Sampling Guide

# Description of the §1915(c) HCBS Waiver Authority

## Overview

This section provides a summary description of the HCBS waiver program, including its statutory basis and principal features. It also identifies the CMS organizations and units that are responsible for the administration of the waiver program and web-accessible resources that may assist states in designing and operating HCBS waivers.

## Statutory Basis and Legislative History of the HCBS Waiver Authority

§1915(c) of the Social Security Act ("the Act") authorizes the Secretary of Health and Human Services (HHS) to waive certain specific Medicaid statutory requirements so that a state may offer home and community-based services to state-specified target group(s) of Medicaid beneficiaries who need a level of institutional care that is provided under the Medicaid State plan. This provision was added to the Act by §2176 of P.L. 97-35 (Omnibus Budget Reconciliation Act (OBRA) of 1981) and subsequently has been amended by P.L. 99-272, (Consolidated Omnibus Reconciliation Act (COBRA) of 1985), P.L. 99-509 (OBRA 1986), P.L. 100-203 (OBRA 1987), P.L. 100-360 (Medicare Catastrophic Coverage Act of 1988), P.L. 100-647 (Technical and Miscellaneous Revenue Act), P.L. 101-508 (OBRA 1990), and §4743 of P.L. 105-33 (Balanced Budget Act of 1997 – BBA-97). Attachment B to these instructions contains the full text of §1915(c) of the Act, as amended.

Prior to the enactment of §1915(c), the Medicaid program provided for little in the way of coverage for long term services and supports in non-institutional settings but offered full or partial coverage of institutional care. §1915(c) was enacted to enable states to address the needs of individuals who would otherwise receive costly institutional care by furnishing cost-effective services to assist them to remain in their homes and communities.

Section 6086 of the Deficit Reduction Act of 2005 (P.L. 109-171) added §1915(i) to Act. Effective January 1, 2007, states will have the option to cover, under the Medicaid State plan, any or all of the home and community-based services that are specifically listed in §1915(c)(4)(B), not including "other services", to Medicaid eligible individuals who meet certain requirements. This option does not entail applying for a waiver (but it does require submitting a state plan amendment) and it does not include the requirement that beneficiaries require an institutional level of care in order to receive home and community-based services. The §1915(i) authority provides an additional avenue for states to support individuals in the community. A state may employ both the §1915(c) and §1915(i) authorities to fashion a comprehensive approach to the delivery of home and community-based services. The enactment of the §1915(i) authority did not alter the 1915(c) waiver authority. CMS will issue separate guidance concerning the §1915(i) authority.

## Principal Features of the HCBS Waiver Authority

### Basic Framework

The HCBS waiver authority permits a state to offer home and community-based services to individuals who: (a) are found to require a level of institutional care (hospital, nursing facility, or Intermediate Care Facility for the Mentally Retarded (ICF/MR)) under the State plan; (b) are members of a target group that is included in the waiver; (c) meet applicable Medicaid financial eligibility criteria; (d) require one or more waiver services in order to function in the community; and, (e) exercise freedom of choice by choosing to enter the waiver in lieu of receiving institutional care. It is entirely a state option to offer waiver services through its Medicaid program.

not been approved by CMS;

- The state plans to terminate a waiver and requires additional time to phase out the waiver in an orderly fashion;
- CMS has identified through its review of the waiver renewal application that there are substantial problems in the waiver's design that cannot be rectified by the state prior to the expiration of the waiver; or,
- The state requires additional time to satisfactorily resolve quality or financial issues identified by CMS during RO waiver review.

***A state must formally submit a request for an extension in writing to CMS in advance of the approved waiver's expiration date.*** Extension requests are reviewed by CMSO/DEHPG, which makes the determination whether to approve the request. Extensions are considered on a case-by-case basis. When a request for extension arises out of the need to address significant waiver design problems identified by CMS during its review of the waiver renewal application or rectify quality or financial issues previously identified by the RO, CMS will not approve the temporary extension request unless and until the state submits a satisfactory action plan with specific milestones to resolve the problems. CMS also will require the state to report its progress in implementing the action plan during the extension period. Temporary extensions are only granted for a period of up to 90-days.

All or part of the temporary extension approved by CMS may be subsumed into the period of the waiver renewal. For example, if the waiver was due to expire June 30 but a 90-day temporary extension was approved through September 30, the state may request that the renewal be effective on July 1 or October 1.

## Policies Concerning Waiver Amendments

Amendments to an approved waiver may be submitted at any time. As is the case with new or renewal waiver applications, CMS has 90 calendar days within which to approve or disapprove the amendment or formally request additional information in order to address problems that have been identified in the amendment request. When an RAI is issued concerning an amendment, the clock is stopped and only restarted (with a full 90-day clock) once the state responds to the RAI.

Whenever there is a change that affects an element of the approved waiver, the state must submit an amendment to the waiver. The approved waiver must be kept in synchronization with state waiver policies, practices, procedures and operations. For example, if a state wants to alter a limit that it has imposed on the amount, frequency or duration of a waiver service, an amendment must be submitted. The revised waiver application is designed to minimize to the extent possible the need to submit amendments. For example, the revised application does not require states to submit (and thereby make part of the application) various waiver forms. Hence, states no longer will have to submit a "technical" amendment when, for example, the service plan form is modified.

States also are alerted that CMS no longer provides for the practice of a state's notifying CMS by letter that it is making budget-driven changes to the waiver participant cap. All changes in the approved waiver must be made via the submission of a waiver amendment. For example, if a state finds it necessary to reduce the waiver participant cap because state appropriations will not support the number of persons specified in the waiver, the state must submit an amendment to reduce the participant cap specified in Appendix B-3 of the application.

A state may propose that an amendment take effect prospectively on some future date. An amendment also may be made retroactive to the first day of a waiver year (or another date after the first day of the waiver year) in which the amendment is submitted unless the amendment

would result in a reduction of the number of persons served, services provided or providers. In these circumstances, amendments may only take effect on or after the date when the amendment is approved by CMS. When an amendment would have the effect of reducing the number of waiver participants, the state also should review CMS guidance in Olmstead Letter #4 (located in Attachment D to the instructions).

As a result of its review of the annual waiver report (CMS-372), CMS may instruct the state to submit a waiver amendment when the CMS review reveals that the state is serving a significantly greater number of persons than provided in the approved waiver, actual waiver expenditures substantially diverge from the amounts in the approved waiver, or the state is providing services not included in the approved waiver. When the annual waiver report reveals that the waiver may not be cost-neutral, CMS may require the state to take remedial actions to correct the problem (see the next part of the instructions).

## Related Topics

### CMS Technical Assistance

States are encouraged to confer with CMS when preparing preliminary initial and renewal waiver applications or significant amendments in advance of their formal official submission to CMS. Such informal consultation prior to the formal submission may expedite CMS review of the formal submission. States also may request technical assistance concerning waiver operations. Technical assistance should be requested through the Regional Office, which will confer with DEHPG as necessary to address questions or technical aspects of the proposed waiver.

### Waiver Termination

A state may elect to terminate the operation of an approved waiver before its expiration date. As provided in 42 CFR §441.307, when the state elects to terminate the waiver prior to its expiration date, the state must notify CMS in writing at least 30-days in advance before terminating services to waiver participants. Also, in accordance with 42 CFR §431.210, the state must notify waiver participants at least 30-days in advance before terminating their services as the result of ending the waiver.

As provided in 42 CFR §441.304(d), CMS may terminate a waiver when it finds that the state is not meeting one or more waiver requirements (e.g., the state has not assured the health and welfare of waiver participants or the waiver is not cost neutral). CMS may terminate a waiver for one or more of the following reasons:

- The health and welfare of waiver participants has been jeopardized;
- The waiver is not cost-neutral;
- The state has not submitted required annual waiver reports;
- Accurate financial records have not been maintained to document the cost of waiver services;
- The waiver has not been operated in a manner consistent with the approved waiver; and/or,
- The waiver has not been operated in accordance with other applicable Federal requirements.

When CMS determines that it is necessary to terminate a waiver, it gives the state notice of its findings and the opportunity for a hearing to rebut these findings. After the notice and hearing, CMS may terminate the waiver. As provided in 42 CFR §441.308, the procedures specified in Subpart D of 42 CFR §430 apply to a state's request for a hearing concerning a waiver termination. If CMS terminates the waiver, the state must notify affected waiver participants at least 30-days in advance before terminating their services.

# Appendix A: Waiver Administration and Operation

## Brief Overview

This appendix identifies the state agency that is responsible for the day-to-day waiver administration and operation, other contracted entities that perform waiver operational functions, and, if applicable, local/regional entities that have waiver administrative responsibilities. The Appendix also provides for indicating how specific waiver operational functions and activities are distributed among state, local/regional and other entities

## Requirements: Waiver Administration and Operation

The administration and operation of waivers frequently involves the collaboration of the Medicaid agency and other state agencies. In addition, the operation of waivers is often decentralized and local agencies play important roles in facilitating the access of individuals to the waiver, including performing waiver operational functions. CMS recognizes that it may be efficient and effective for a state to locate the operation of a waiver with an agency other than the Medicaid agency and link the delivery of waiver services to other Federal, state and local programs. Appendix A describes the administrative structure under which the waiver is operated. When waiver administrative and operational functions are performed by other entities on behalf of the Medicaid agency, certain requirements must be met.

In accordance with 42 CFR §431.10, the Medicaid agency is responsible for ensuring that a waiver is operated in accordance with applicable Federal regulations and the provisions of the waiver itself. The Medicaid agency may not delegate its authority over a waiver to another state entity. When the Medicaid agency delegates to another agency, provided that the other state agency and the Medicaid agency enter into an agreement that specifies the waiver administrative and operational activities and functions that the other agency performs as delegated and under the supervision of the Medicaid agency. In the application, when a waiver is operated by another state agency, the sister agency is referred to as the "operating agency."

The State Medicaid Agency may be an umbrella agency with numerous divisions, units or administrations within its domain. When a division, unit or administration within the umbrella State Medicaid Agency conducts waiver administrative activities, the State must describe the methods enlisted by the State Medicaid Director to provide oversight and guidance related to those activities. These mechanisms may include performance plans of direct reports, internal delegation documents or other formal mechanisms that impart delegated functions from the State Medicaid Director to a division within the broader Medicaid agency.

The requirement that the Medicaid agency maintain its authority over the waiver means that any rules, regulations and policies that govern how the waiver is operated must be issued by the Medicaid agency rather than by the operating agency. In issuing rules, regulations and policies that affect the waiver, the Medicaid agency may incorporate by reference rules, regulations and policies that have been adopted by the operating agency (or another state agency – e.g., rules and regulations concerning provider qualifications). In short, the operating agency may not independently promulgate rules, regulations and policies that have a material effect on the provision of waiver services and how waiver processes are conducted. Policies and other types of guidance concerning waiver operations may be issued jointly by the Medicaid agency and the operating agency. Alternatively, the Medicaid agency may formally approve policies and guidance developed and issued by the operating agency.

A state also may arrange for the performance of waiver operational and administrative

functions by contracted entities. For example, the Medicaid agency or the operating agency (if applicable) may enter into a contract with a private entity to conduct quality improvement functions (e.g., conduct periodic surveys of waiver participants) that are necessary for the proper and efficient administration of the waiver. Such contractual arrangements are subject to the provisions of 42 CFR Part 434 (contracts) or such other Federal regulations as may apply (e.g., the procurement regulations in 45 CFR § 92.42).

Finally, a state also may provide that local/regional non-state entities perform waiver operational and administrative functions in order to link the provision of waiver services with other Federal, state and local programs that are operated by such entities. Such entities may include public county human services agencies or other types of local human services agencies (e.g., Area Agencies on Aging – AAAs). For example, a state may provide that entrance to a waiver that serves older persons takes place through the state's AAA network in order to link the provision of waiver services to Older Americans Act programs and services. When local/regional non-state entities perform waiver operational and administrative function, there must be contracts or agreements in place that authorize the performance of such functions by local/regional non-state entities.

42 CFR§431.10(e) specifies that the Medicaid agency must retain the authority to exercise administrative discretion and issue policies, rules and regulations. If other state or local agencies or contractors perform waiver administrative and operational functions for the Medicaid agency, such entities must not have the authority to change or disapprove any administrative decision of the Medicaid agency or otherwise substitute their judgment for that of the Medicaid agency with respect to the application of policies, rules, and regulations issued by the Medicaid agency. Provider agreements must be executed between the Medicaid agency and the providers.

With respect to HCBS waivers, a state must provide for the consistent, uniform administration and operation of the waiver across all geographic areas where the waiver is in operation. For example, when local/regional non-state agencies perform waiver administrative and operational functions, the state must ensure that consistent decisions are made about the authorization of waiver services wherever a waiver participant may reside. While there may be local variations in how waiver operational functions are conducted, the results should be consistent jurisdiction-to-jurisdiction. As previously noted in the instructions for the Application/Module 1, if the state wishes to provide different services or utilize different approaches to service delivery in different parts of the state, the state should consider applying to operate separate waivers in each area of the state. Absent a waiver of statewideness, it is expected that the waiver will be administered and operated in a consistent fashion in all parts of the state and, thereby, ensure that waiver services are provided on a comparable basis to the entire target group of waiver participants in compliance with 42 CFR §440.240(b) (comparability of services for groups).

When waiver administrative and operational functions are performed by other entities on behalf of the Medicaid agency, the Medicaid agency should have a formal, written document expressly delegating the functions to be performed, and the Medicaid agency must supervise the performance of these functions. Supervision does not mean that the Medicaid agency must review and approve each and every action taken by another entity. It is expected that the Medicaid agency will conduct or arrange for the periodic assessment of the performance of other entities in conducting waiver administrative and operational activities to ensure that the waiver is operated in accordance with the approved waiver and applicable Federal requirements. In its Quality Improvement Strategy for the waiver, the state describes how it will assure that the "Medicaid agency retains ultimate authority and responsibility for the operation of the waiver by exercising oversight over the performance of waiver functions by

other state and local agencies (if applicable) and contracted entities."

## Detailed Instructions for Completing Appendix A

### Item A-1: State Line of Authority for Waiver Operation

#### Instructions

Select whether the waiver is operated by the Medicaid agency or by another state agency. When the waiver is operated by the Medicaid agency, specify whether it is operated by the Medical Assistance Unit or another division/unit within the Medicaid agency. When the waiver is operated by another state agency, specify the state agency and complete Item A-2.

#### Technical Guidance

This item identifies the state agency that has day-by-day administrative and operational responsibility for the waiver. The waiver may be operated by the Medicaid agency or another state agency under an agreement with the Medicaid agency. The Medicaid agency is the single State agency designated in accordance with 42 CFR §431.10(b)(1) to administer or supervise the State plan. The Medical Assistance Unit is the unit within the Medicaid agency that is established pursuant to 42 CFR §431.11(b) and in some states is synonymous with the Medicaid agency. In some states, the Medicaid agency is a state department/agency rather than a division/unit within a state department/agency. When this is the case, the State Medicaid agency may delegate the operation of the waiver to another division/unit within the umbrella Medicaid agency or assign this responsibility to its Medical Assistance Unit. When a division/unit other than the Medical Assistance Unit is responsible for operating the waiver, the waiver is considered to be operated by the Medicaid Agency. In responding to this item, specify whether the waiver is operated by the Medical Assistance Unit or another Medicaid agency division/unit. The State Medicaid Agency may be an umbrella agency with numerous divisions, units or administrations within its domain. When a division, unit or administration within the umbrella State Medicaid Agency conducts waiver administrative activities, the State must describe the methods enlisted by the State Medicaid Director to provide oversight and guidance related to those activities. These mechanisms for oversight may include performance plans of direct reports, internal delegation documents or other formal mechanisms that impart delegated functions from the State Medicaid Director to a division within the broader Medicaid agency. If the waiver is operated by a division, unit or administration within the Medicaid agency that differs from the Medical Assistance Unit, complete Item A-2-a.

Alternatively, a waiver may be operated by another state agency that is not the Medicaid agency. This practice is relatively common. States frequently locate waiver operational responsibility with a state agency that has programmatic and other responsibilities for the full range of services (including services funded by state and/or Federal funds other than Medicaid) that are furnished to a target populations (e.g., older persons). The other state agency may be located in the same department as the Medicaid agency but is not organizationally a part of the Medicaid agency or located in a different state department.

When the waiver is not operated by a division/unit of the Medicaid agency, there must be a formal, written agreement between the Medicaid agency and the operating agency that explicitly spells out the waiver activities and functions that the operating agency performs on behalf of the Medicaid agency. This agreement may take the form of an interagency agreement or a memorandum of understanding. Do not submit the agreement as part of the waiver application. If CMS needs to examine the agreement, it will request a copy from the Medicaid agency.

There are no established specifications for these agreements. An agreement, however, must be

sufficiently detailed so that it clearly delineates those activities, functions and responsibilities that the Medicaid agency delegates to the operating agency and the responsibilities of the operating agency in carrying out those functions . The agreement need not be confined solely to the operation of the waiver (e.g., it may address additional topics as well) and an agreement may span the operation of more than one waiver so long as operating agency responsibilities for each waiver are clearly delineated.  The agreement may not undermine the ultimate authority and responsibility of the Medicaid agency for the operation of the waiver, including meeting the waiver assurances.  The agreement also may serve as the basis for claiming administrative FFP for the proper and necessary costs that are incurred by the operating agency in administering the waiver.

## Item A-2: Medicaid Agency Oversight of Waiver Administration

### Item A-2-a

### Instructions

This item is only completed when a division/unit (or administration) within the umbrella State Medicaid agency, other than the Medical Assistance Unit, operates the waver. In the text field, specify the methods employed by the State Medicaid Director (in some instances, the individual is also the head of the umbrella State agency) to provide oversight and guidance related to those activities. These mechanisms for oversight may include performance plans of direct reports, internal delegation documents or other formal mechanisms that impart delegated functions from the State Medicaid Director to a division within the broader Medicaid agency.

When the waiver is operated by another division/unit/administration within the umbrella Agency designated as the Single State Medicaid Agency. Specify (a) the functions performed by that division/administration (i.e., the Developmental Disabilities Administration within the Single State Medicaid Agency), (b) the document utilized to outline the roles and responsibilities related to waiver operation, and (c) the methods that are employed by the designated State Medicaid Director in the oversight of these activities.

### Technical Guidance

As noted above, when the waiver is operated by a division/unit/administration of the Medicaid agency that is outside of the Medical Assistance Unit or another division of Medicaid, the State must ensure that the division of the umbrella agency is performing its assigned waiver operational tasks and administrative functions in accordance with waiver requirements. States (and State Medicaid Directors) have discretion to establish these mechanisms, which will vary depending on the umbrella State Medicaid agency structure and internal reporting systems.

### Item A-2-b

### Instructions

This item is only completed when the Medicaid agency does not operate the waiver.  In the text field, specify the methods that the Medicaid agency uses to ensure that the operating agency performs its assigned waiver operational and administrative functions in accordance with

waiver requirements. Also, specify the frequency of Medicaid agency assessment of operating agency performance.

**Technical Guidance**

As noted above, when a waiver is not operated by the Medicaid agency, the Medicaid agency must ensure that the operating agency performs its assigned waiver operational and administrative functions in accordance with waiver requirements. States have discretion in determining Medicaid agency oversight methods. The methods employed will hinge on the specific scope and nature of the functions and activities that the operating agency performs. These will include the functions and activities indicated in Item A-7 (see next section) and others specified elsewhere in the application. It is important to keep in mind that Medicaid agency oversight need not take the form of the Medicaid agency reviewing and approving each operating agency action (e.g., reviewing all the service plans that the operating agency already has reviewed) or the redundant performance of functions and activities that are carried out by the operating agency (e.g., replicating look-behind type reviews of case manager performance when the operating agency already conducts such reviews). Medicaid agency oversight may be exercised in a variety of ways, including providing that the operating agency track and periodically report to the Medicaid agency its performance in conducting operational functions (e.g., reporting how promptly service plans are developed and implemented once a participant has entered the waiver).

It is important to emphasize that the state Medicaid agency and the operating agency should work together to ensure that the waiver is operated in accordance with Medicaid rules, and that the services delivered are appropriate for the populations served. The knowledge of Medicaid requirements and the requisite program knowledge often contained within the operating agency represent the need for a strong collaborative relationship in the operation of the waiver. The Medicaid agency retains ultimate authority and control over the waiver, but in order to effectuate a strong, Medicaid compliant service delivery mechanism, the State should establish clear and strong lines of communication between the operating agency and the State Medicaid agency.

As noted previously, the state's Quality Improvement Strategy must describe how the state assures that the Medicaid agency maintains its authority over the waiver. Oversight of operating agency performance is an element of this assurance. As applicable, the oversight methods described here must be cited in the QIS section related to the Administrative Authority of the State Medicaid agency.

---

**CMS Review Criteria**

- The Medicaid agency's oversight methods span the full range of operational and administrative responsibilities of the division/unit/administration within the Medicaid agency and the operating agency including its oversight of contracted and local/regional entities' functions as specified in Item A-7 and elsewhere in the application.
- The frequency of oversight is specified.

---

## Waiver Operational and Administrative Functions

Items A-3 and A-4 require identifying whether contracted entities and/or local/regional non-state entities perform waiver operational and administrative functions. Item A-7 lists specific functions that such entities might perform. The response to Items A-3 and A-4 hinges on whether contracted entities or local/regional non-state entities perform one or more of the

functions listed in Item A-7.

The list in Item A-7 is not inclusive of all waiver operational and administrative functions. The list generally does not include functions that are addressed elsewhere in the application (e.g., the performance of case management activities such as monitoring service plan implementation (addressed in Appendix D-2).

The operational and administrative functions listed in Item A-7 are defined as follows:

- **Participant waiver enrollment.**  This function includes performing waiver intake activities, including taking applications to enter the waiver and referring, when necessary, individuals for the determination of Medicaid eligibility and/or disability.

- **Waiver enrollment managed against approved limits**.  This function includes ensuring that the waiver's participant limit (as provided in Appendix B-3) is not exceeded and managing entrance to the waiver by applying the state's policies concerning the selection of individuals to enter the waiver (as also provided in Appendix B-3).  The function also might include establishing and maintaining a waiting list for entrance to waiver, if necessary.  When waiver capacity is allocated by locality or region, local/regional non-state agencies may also be involved in managing enrollment.

- **Waiver expenditures managed against approved levels**.  This function includes monitoring waiver expenditures to assure that the waiver is cost neutral and operates within the estimates in the approved waiver (and, as necessary, preparing waiver amendments to modify cost estimates).  Usually, this function is performed by a state agency.

- **Level of care evaluation**.  Such activities may include compiling the information that is necessary to evaluate potential entrants to the waiver and the continuing need for the level of care that the waiver provides for waiver participants.  It may also include the review of such information by the state or a contracted entity in order to determine that an individual meets level of care criteria.  However, if the LOC evaluation results in XIX eligibility, the final decision must be a Medicaid agency decision since only the Medicaid Agency can make an eligibility decision. Thus, another agency in the state can conduct the evaluations, but only the Medicaid agency can make the final decision.

- **Review of participant service plans**.  This activity may include local/regional entity review of service plans or, if required by the state, the review and approval of service plans by the Medicaid agency or the operating agency (if applicable).  The focus is on activities that take place once a service plan has been developed but prior to its implementation.  The function does not include the retrospective review of service plans that might be conducted by the Medicaid agency in order to (a) meet the requirement that service plans are subject to the approval of the Medicaid agency (as provided in Appendix D-1) or (b) determine retrospectively whether service plans appropriately address the needs of waiver participants, a quality improvement activity that is addressed in the State's QIS.

- **Prior authorization of waiver services**.  This function refers to the review of the necessity of specific waiver services before they are authorized or delivered.  It does not refer to review of the overall service plan.  For example, a waiver might provide for the provision of crisis stabilization services under certain circumstances but require that the provision of such services be reviewed prior to their authorization.  Alternatively, a waiver might provide that additional services may be authorized over and above the limit on the dollar amount established in Appendix C-4 of the waiver but require prior

authorization for such services.

- **Utilization management.** Utilization management includes processes to ensure that waiver services have been authorized in conformance to waiver requirements and monitoring service utilization to ensure that the amount of services is within the levels authorized in the service plan or that services utilized have been authorized in the service plan. It also may include identifying instances when individuals are not receiving services authorized in the service plan or the amount of services utilized is substantially less than the amount authorized to identify potential problems in service access.

- **Qualified Provider enrollment.** Qualified provider enrollment refers to the performance of standard provider enrollment processes conducted by the State Medicaid Agency, as well as any delegated functions related to the recruitment and enrollment of providers.

- **Execution of Medicaid provider agreements.** §1902(a)(27) of the Act and 42 CFR §107 require that there be an agreement between the Medicaid agency and each provider that furnishes services under the waiver. In some instances (e.g., when a state contracts with an Organized Health Care Delivery System (OHCDS) to furnish waiver services), the provider agreement is executed with an organization that contracts with other providers to furnish waiver services but these providers do not have an agreement with the Medicaid agency. Except in these cases (which are discussed where applicable elsewhere in the instructions), there must be a provider agreement between the Medicaid agency and each waiver provider. Such agreements may be multi-party agreements (e.g., the agreement may be made by the Medicaid agency, the operating agency and the provider).

  The Medicaid agency may assign to another entity (e.g., the operating agency, a county agency, or a financial management services entity that supports waiver participants to direct their own services) the responsibility to execute (sign) the provider agreement on behalf of the Medicaid agency. *If the Medicaid agency chooses to assign this administrative function to another entity, the Medicaid agency must assign this responsibility in writing to the entity.* For example, if counties are authorized to execute the provider agreement on behalf of the Medicaid agency, the authorization may be included in the agreement between a county and the Medicaid agency to perform waiver operational and administrative functions. However, the Medicaid agency cannot delegate its statutory responsibilities for oversight and standard setting. In carrying out this administrative responsibility, the entity that executes the provider agreement may not alter the provisions of the agreement. If the entity to which this administrative function is assigned also provides waiver services to participants, it must execute a provider agreement directly with the Medicaid agency – not itself – for services that the entity provides.

- **Establishment of Statewide Rate Methodology.** A state must have uniform and consistently applied policies concerning the determination of waiver payment amounts or rates. This topic is addressed in more detail in the instructions for Appendix I-2. When this function is performed by entities other than the Medicaid agency, the entity must follow the state's uniform policies.

- **Rules, policies procedures and information development governing the waiver program .** This function includes the development of any rules, policies and procedures that govern the waiver. While other entities may be involved in the development of these items, the State Medicaid Agency must retain ultimate approval authority. This function may also include making information about the waiver available via the Internet, performing outreach through such organizations as AAAs and consumer support groups,

identifying potential enrollees through the operation of a single-point-of-entry or "no wrong door" service access point, and providing individuals with information about the waiver.

- **Quality assurance and quality improvement activities**   This function refers to the activities related to discovery and remediation activities conducted for the waiver, as well as the mechanisms for overall systems improvement.

## Item A-3: Use of Contracted Entities

### Instructions

Based on the listing of waiver operational and administrative functions in Item A-7 (as described above), indicate whether contracted entities perform one or more of those activities. If so, identify (in the text field) the types of contracted entities and briefly describe the functions that they perform. Also, complete Items A-5 and A-6. When contracted entities do not perform any of the functions listed in Item A-7, select the second choice.

### Technical Guidance

Waiver operational activities and functions may be performed by entities that are under contract with the Medicaid agency or the operating agency (if applicable). For the purpose of this item, contracted entities are third-parties that perform functions that are otherwise usually conducted by the state agency. In the context of this item, contracted entities do <u>not</u> include waiver providers or local/regional non-state entities (e.g., counties). In the case of the latter, their role in waiver operations is addressed in items A-4 through A-6 and in item A-7. For example, the evaluation of level of care often is conducted by a Professional Review Organization (PRO) under contract to the Medicaid agency. Other examples of administrative activities and functions that might be performed by a contracted entity include utilization management, prior authorization of selected services, and the determination of provider rates using the methodology developed by the Medicaid agency. As applicable, contracted entities may include entities that furnish financial management services under an administrative contract to waiver participants who direct their services. When using contracted entities to perform waiver operational activities, the State Medicaid agency should expressly delegate the performance of these activities in writing.

Since multiple contractors might perform waiver operational and administrative functions, describe the types of contracted entities that perform these functions (e.g., a PRO, the state's Medicaid fiscal agent, a consumer organization). Do not identify by name the specific entity that performs a function (because if a different contractor is selected to perform a function during the period that the waiver is in effect, an amendment would have to be submitted to modify this item). Also, because multiple contractors might be employed, briefly describe the functions that each type of contractor performs.

### §1915(b)/§1915(c) Concurrent Waivers

When a §1915(c) waiver is operated concurrently with a §1915(b) waiver, managed care entities may perform several waiver operational and administrative functions in conjunction with their delivery of services to beneficiaries. For example, such entities determine payment amounts for providers in their networks and usually have responsibilities concerning enrollment of individuals. For the purpose of the §1915(c) waiver application, managed care entities that perform the waiver operational and administrative functions listed in Item A-7 are considered to be "contracted entities." Therefore, identify when managed care entities perform these functions and briefly list the functions that these entities perform. Specify the types of entities (e.g., PIHP). Do not list the entities (the specific entities must be identified in the 1915(b) waiver application). As appropriate, include entities other than managed care entities

that may perform §1915(c) operational and administrative functions under the provisions of the 1915(b) waiver (e.g., an External Quality Review Organization – ERQO).

> **CMS Review Criteria**
>
> When waiver operational and administrative activities are performed by contracted entities, the waiver specifies the types of entities that perform such activities and describes the types of activities that are performed by each type of entity.

## Item A-4: Role of Local/Regional Non-State Entities

### Instructions

Select whether public and/or non-governmental local/regional non-state entities perform waiver operational and administrative functions. If so, specify the nature of these entities. When such entities perform such functions, complete Items A-5 and A-6.

### Technical Guidance

In many states, local/regional non-state entities (e.g., Area Agencies on Aging, county human services agencies, regional mental health/developmental disabilities authorities) play important roles in the provision of services and supports for individuals who need long-term services and supports. These entities often are established under the provisions of state law and have responsibilities for intake, service coordination and resource development. Some states also assign waiver operational and administrative responsibilities to these non-state entities. For the purpose of this item, local/regional non-state entities do not include local/regional offices of the Medicaid agency or the operating agency (if applicable). Such offices are considered to be part of their parent state agency.

Before responding to this item, look over the list of activities and functions in item A-7. If local/regional non-state entities do not perform any of those activities/functions, select the "not applicable" choice and proceed to item A-7. If local/regional non-state entities perform any of the listed functions, then complete this item and proceed to items A-5 and A-6.

The application identifies two types of local/regional non-state entities:

- **Public agencies.** Public agencies include counties or other governmental entities that are under the control of local elected officials. When public agencies are assigned waiver administrative and operational responsibilities, there must be an interagency agreement, memorandum of understanding or contract in effect that details their responsibilities. The agreement may be between the Medicaid agency and each entity or may be a three-way agreement among the Medicaid agency, the operating agency and each entity. The agreement must preserve the authority of the Medicaid agency over the operation of the waiver.

- **Non-governmental entities.** The second type of local non-state entity is a non-governmental entity. Such entities include non-profit entities established under state and/or Federal law to conduct specified human services functions in a specified geographic area. Area Agencies on Aging usually fall under this classification. In some states, there are non-profit, county or multi-county developmental disabilities authorities that serve as the single point of entry for state-funded services and conduct other specified activities. Other states have established non-governmental regional authorities that include elected officials on their governing bodies but are not considered to be governmental entities. When entities of this type perform waiver operational and administrative functions, there must be a *contract* that details the waiver operational functions that these entities perform. When the waiver is not operated by the Medicaid

# EXHIBIT C

maintenance, upkeep or improvement to the individual's own home or that of his/her family. The nature and the types of residential habilitation services to be furnished to the waiver participant will be set out in the individual's support plan.

**Specify applicable (if any) limits on the amount, frequency, or duration of this service:**

**Service Delivery Method** *(check each that applies)*:

- ☐ **Participant-directed as specified in Appendix E**
- ☑ **Provider managed**

**Specify whether the service may be provided by** *(check each that applies)*:
- ☐ **Legally Responsible Person**
- ☑ **Relative**
- ☑ **Legal Guardian**

**Provider Specifications:**

| Provider Category | Provider Type Title |
|---|---|
| Individual | Certified Family Home Providers |
| Agency | Residential Habilitation Agency |

## Appendix C: Participant Services

### C-1/C-3: Provider Specifications for Service

**Service Type: Statutory Service**
**Service Name: Residential Habilitation**

**Provider Category:**
Individual ▾
**Provider Type:**
Certified Family Home Providers
**Provider Qualifications**
**License** *(specify)*:

**Certificate** *(specify)*:
Certified Family Home certificate as described in Idaho Administrative Code at IDAPA 16.03.19.
**Other Standard** *(specify)*:
Must be affiliated with Residential Habilitation Agency and meet the standards contained in IDAPA 16.03.10.705 and IDAPA 16.04.17 including:

Be at least 18 years of age; be a high school graduate or have a GED or demonstrate the ability to provide services according to an individual support plan; have current CPR and First Aid certifications; be free from communicable diseases; pass a criminal background check; have appropriate certification or licensure if required to perform tasks which require certification or licensure. Prior to assisting with participant medications, providers must successfully complete and follow the approved "Assistance with Medications" course.

Participate in an orientation program prior to performing services. The orientation program must include the following subjects: the purpose and philosophy of services; service rules; policies and procedures; proper conduct in relating to waiver participants; handling of confidential and emergency situations that involve the waiver participant; participant rights; methods of supervising participants; working with individuals with developmental disabilities; and training specific to the needs of the participant.

Additional training must be completed within six months of affiliation with the residential habilitation agency and must include: instructional techniques - methodologies for training in a systematic and effective manner; managing behaviors - techniques and strategies for teaching adaptive behaviors; feeding; communication; mobility; activities of daily living; body mechanics and lifting techniques; housekeeping techniques; and maintenance of a clean, safe, and healthy environment.

The residential habilitation agency is responsible for providing on-going training specific to the needs of the participant as needed.

All skill training for direct service staff must be provided by a Qualified Mental Retardation Professional (QMRP) who has demonstrated experience in writing skill training programs.

**Verification of Provider Qualifications**
    **Entity Responsible for Verification:**
    Deparment of Health & Welfare
    **Frequency of Verification:**
    Certification of Certified Family Home reviewed annually.  Residential habilitation provider requirements reviewed at least every two years.

# Appendix C: Participant Services
## C-1/C-3: Provider Specifications for Service

| Service Type: Statutory Service |
| --- |
| Service Name: Residential Habilitation |

**Provider Category:**
Agency ▼
**Provider Type:**
Residential Habilitation Agency
**Provider Qualifications**
    *License (specify):*

    *Certificate (specify):*
    As described in IDAPA 16.04.17 and IDAPA 16.03.10.705.
    *Other Standard (specify):*
    Residential Habilitation Agencies must comply with all standards contained in IDAPA 16.03.10.705 and IDAPA 16.04.17.  As outlined in these rules, direct service staff must meet the following qualifications:

    Be at least 18 years of age; be a high school graduate or have a GED or demonstrate the ability to provide services according to an individual support plan; have current CPR and First Aid certifications; be free from communicable diseases; pass a criminal background check; have appropriate certification or licensure if required to perform tasks which require certification or licensure.  Prior to assisting with participant medications, providers must successfully complete and follow the approved "Assistance with Medications" course.

    Participate in an orientation program prior to performing services.  The orientation program must include the following subjects: the purpose and philosophy of services; service rules; policies and procedures; proper conduct in relating to waiver participants; handling of confidential and emergency situations that involve the waiver participant; participant rights; methods of supervising participants; working with individuals with developmental disabilities; and training specific to the needs of the participant.

    Additional training must be completed within six months of affiliation with the residential habilitation agency and must include: instructional techniques - methodologies for training in a systematic and effective manner; managing behaviors - techniques and strategies for teaching adaptive behaviors; feeding; communication; mobility; activities of daily living; body mechanics and

# EXHIBIT D

B/Z

C

D

E

F

G

H

I

J

K

L

M

N

O

P

Q

R

S

T

U

V

W

 IDAHO DEPARTMENT OF
# HEALTH & WELFARE

C.L. "BUTCH" OTTER – Governor
RICHARD M. ARMSTRONG -- Director

LESLIE M. CLEMENT - Administrator
DIVISION OF MEDICAID
Post Office Box 83720
Boise, Idaho 83720-0009
PHONE: (208) 334-5747
FAX: (208) 364-1811

June 10, 2011

Dear Certified Family Home Provider:

Over the past few years, Idaho Legislation has directed the Department to enter into selective contracts for services. This direction was first provided to the Department in 2006, subsequently in House Bill 701 in 2010, and finally by direction contained in House Bill 260 in 2011. In compliance with this Legislative direction, the Department would like to announce that a contract has been awarded to Community Partnerships of Idaho, Inc. for "Residential Habilitation Program Coordination for Certified Family Home Providers". This contract was executed on June 6, 2011, and will be implemented on August 5, 2011. The contract service will replace the developmental disability (DD) waiver service currently known as "residential habilitation agency-affiliation."

If you are a Certified Family Home provider, serving a participant on the DD Waiver, the Department would like to provide you with the information about this contract and how it will affect you. The contract services will be provided by Community Partnerships of Idaho, Inc. through QMRP professionals who will develop, implement, and monitor the participant's habilitation programming in your certified family home. It is important for you to know:

- There will not be any interruption in any services provided to the participant living in your home as a result of implementing this contract.
- IDAPA Rules will be submitted to publish as temporary/proposed in August 2011 in IDAPA 16.03.10 which will reflect the requirement for CFH providers to affiliate with the department or its contractor for residential habilitation program coordination.
- You may expect that the contractor, Community Partnerships of Idaho, Inc. will be contacting you in June and July in order to begin preparation of implementing the services beginning August 5, 2011.
- The residential habilitation agency provider that you currently affiliate with will cease provision of residential habilitation agency affiliation services to you on August 4, 2011.
- Pursuant to your provider agreement with the Department, and in order to assure that there are no interruptions in your provision of residential habilitation services to participants, the Department and their contractor require your cooperation.
- CFH provider requirements indicted in IDAPA 16.03.19 have not changed.
- CFH providers who need Licensing and Certification assistance should contact the statewide Certified Family Home Program Manager at (208) 239-6260.

## Community Partnerships of Idaho, Residential Habilitation Program Coordination

Services which will be provided as part of the contract with Community Partnerships of Idaho, Inc. include, but are not limited to the following:

Certified Family Home Provider
June 10, 2011
Page 2 of 2

- CFH Orientation & Training
- Provider Skills Training
- Training on completing CFH provider status reviews
- Access to training modules and community resources
- Provider review of implementation plans quarterly
- Assistance with Molina billing as requested
- Face to face meetings one time per year
- Training at yearly face to face meeting related to implementation plans
- Follow up phone calls to providers as needed to discuss implementation program plan changes

**Resources available for Participant Assistance**

**Program Coordinator**
A CFH provider may contact the new program coordination contractor beginning August 5, 2011, for any of the following reasons:

- A participant would like to move
- There is a change in the status of the participant prior to the end of the plan year which requires program changes
  - Contact Information:
    Community Partnerships of Idaho, Inc.
    Jackie Hanson, Contract Manager
    (208) 376-4666 or Toll Free 1-800-850-7511

**Adult Service Coordination**
If a CFH provider has concerns about any participant case management or crisis need, the recommended contact for assistance is the participant's service coordinator. The service coordinator should be contacted:

- When it is necessary to change a participant's individual service plan (ISP) or specific goals or actions because of the participant's medical, psychiatric, social, educational, or other service needs.
- When the participant needs help linking with activities related to their medical, psychiatric, social, educational, or other service needs.
- When monitoring or follow up service coordination activities are necessary due to a change in the status of the participant, making it necessary to adjust the plan and arrange additional services.
- When a participant is in crisis and needs to access community resources in order to resolve a crisis.

We appreciate your services as a Certified Family Home provider for developmental disability waiver participants and your cooperation in the Department's efforts to comply with Legislative direction, while maintaining the quality and integrity of the services provided to Idaho Medicaid participants.

Sincerely,

LESLIE M. CLEMENT
Administrator

LMC/ksl

# EXHIBIT E



# IDAHO DEPARTMENT OF
# HEALTH & WELFARE

C.L. "BUTCH" OTTER – Governor
RICHARD M. ARMSTRONG – Director

LESLIE M. CLEMENT - Administrator
DIVISION OF MEDICAID
Post Office Box 83720
Boise, Idaho 83720-0009
PHONE: (208) 334-5747
FAX: (208) 364-1811

June 24, 2011

Dear Residential Habilitation Agency:

Over the past few years, the Idaho Legislature has directed the Department to enter into selective contracts for services. This direction was first provided to the Department in 2006, subsequently through House Bill 701 in 2010, and finally by the direction given in House Bill 260 in 2011. One of the services determined to be suitable for selective contracting is affiliation services, currently provided by residential habilitation agencies.

At this time the Department would like to announce, in compliance with 2011 Legislative direction, a contract has been awarded to Community Partnerships of Idaho, Inc. (CPI) for "Residential Habilitation Program Coordination for Certified Family Home (CFH) Providers." This contract was executed on June 6, 2011, and will be implemented on August 5, 2011.

Please be advised beginning August 5, 2011, the service currently entitled "Residential Habilitation Agency – Affiliation" and billed using procedure code T2025, will no longer be offered as a waiver benefit. Providers of this service may submit claims using procedure code T2025, for dates of service prior to August 5, 2011. Claims submitted using procedure code T2025, for date of service beginning with August 5, 2011 and forward, will be denied.

In accordance with your provider agreement, please cooperate with the Department and CPI in our efforts to avoid any interruption to participant services. As the Department contractor, CPI is authorized to request participant records related to Medicaid services. Please send the following documents for each Developmental Disability Waiver, CFH participant you serve by e-mail to pcdata@cp-of-idaho.com, or fax (208) 376-4988, no later than July 8, 2011:

- Current Residential Habilitation Program Plan
- Current Program Implementation Plans
- Current Provider Status Review form

Thank you for participating as a Medicaid Provider of developmental disability waiver services and for your cooperation in the Department's efforts to comply with Legislative direction, while maintaining the quality and integrity of the services provided to Idaho Medicaid participants.

Sincerely,

LESLIE M. CLEMENT
Administrator

LMC/rs